On Rehearing.
No objection is made in the application to the opinion in so far as it-appertains to the appellee’s motion to dismiss, but it rests mainly *1333 upon the proposition that it is inconsistent with that rendered in -the case of Winter vs. Davis, decided on the same day, wherein we .affirmed a jugdment dissolving an attachment.
Our opinion is predicated upon the stipulations of the following -written contract, viz.:
“ Lake Providence, La., April 25, 1893.
“ For and in consideration of an advance of twenty-five hundred -dollars made by the Standard Cotton Seed Oil Company, of New Orleans, this advance to be paid by honoring drafts to the amount of five hundred dollars per month, I bind myself and agree to ship to the said Standard Cotton Seed Oil Company during the season of 1893-94 four hundred tons and as much more of good, sound cotton seed as I can buy or control, this seed to be weighed on landing at .Lake Providence by clerk of steamboat, and credited to me at the .market price and one dollar per ton commission.
“As security for the payment of this advance and the delivery of the four hundred tons of good, sound seed, I will execute a mortgage on the ginhouse and contents, and transfer the insurance to the .Standard Cotton Seed Oil Company. I also agree to give and take interest at the rate of eight per cent, per annum; that is, I will pay interest on the money from date until payment, and I am to be •credited with interest on all shipments of seed. This signed in •duplicate.
“(Signed) • Peter Matheson.
“Witnesses:
“(Signed) A. B. Johnston.
“W. E. Powers.”
To this contract, the obligor, Matheson, gave his note and mort•gage for twenty-five hundred dollars as collateral security.
The suit is brought upon an open account for about two thousand nine hundred dollars, money advanced under the foregoing contract —embracing overdrafts to the amount of about four hundred dollars.
The consideration of said engagement on the part plaintiff was that ■the defendant should ship to them “ during the season of 1893-94 four hundred tons, and as much more of good cotton seed as (he) can ■buy o?’ control; this seed to be weighed on landing at Lake Provi *1334 dence by clerk of steamboat, and credited to (him) at the market price,” etc.
To re-enforce this stipulation the contract further provides, that “ as security for the payment of this advance, and the delivery of the four hundred tons of good cotton seed,” Matheson agreed to execute a mortgage in favor of the oil company.
Our opinion finds, as, a fact, that the oil company not only advanced to the defendant the whole amount of twenty-five hundred dollars in cash on his drafts, without question, but that they advanced to him four hundred dollars more. That these advances were kept up continuously from the date of the contract to the 25th of October of the same year; and during that period of time not a single pound of cotton seed was shipped by the defendant to the company.
That, realizing that defendant was drawing long after cotton had commenced to open, and cotton seed was deliverable, under their contract, without any shipment having been made, plaintiff wired to defendant to ascertain upon what he predicated his drafts, to which he replied, “ against cotton seed stored in my ginhouse.”
That soon afterward plaintiffs sent a representative to Lake Providence to see the defendant and ascertain the facts, and, if possible, to obtain a settlement of their account.
That representative was particularly directed to ascertain “ why (the defendant) was holding the seed, when it was understood he was to ship as the seed reached him from time to time during the season.”
That in pursuance of those instructions, said representative called on the defendant and “ made demand upon him that he comply with his contract and ship the seed he had on hand; and he refused, giving as his reason that it would occasion him extra expense to haul the seed to the landing,” and further stating that “ he would ship when the boats could reach his warehouse, provided (the company) continued to pay his drafts; but if these drafts were not honored and should be returned to him, he would make them good by disposing of the seed he had on hand.”
That he requested of the defendant an explanation of the expenditure of the money which the oil company had furnished him, and he declined to give any.
That immediately after said interview it was discovered that the defendant was preparing his cotton seed for sale, and was actually *1335 waiting for the arrival of the seed boat of the Union Oil Company— a competing organization of the plaintiff — which was expected down the river the following day.
Our opinion finds, as a fact, that instead of defendant having accumulated four hundred tons of cotton seed, as stipulated in the contract, he had on hand, at date of the seizure under the attachment, only about seventy tons, worth six hundred and twenty-two dollars and ninety-five cents, notwithstanding he had received and consumed over twenty-nine hundred dollars of the plaintiffs’ money without making any shipments to them in the meanwhile.
It finds further that the company was engaged in the business of compressing oil from cotton seed, and that the contract with the defendant was entered into for the express object of obtaining cotton seed for the purposes and uses of its business. That it was for that express purpose it had agreed to and did furnish defendant with money to enable him to purchase seed and ship same to them. That when purchased and stored the seed constituted a quasi pledge for defendant’s indebtedness; and that plaintiffs’ money having been invested in the seed, presumably, it had a right to rely upon same as security for its outlay.
That, looking at the result of the enterprise, plaintiffs were in the attitude of having advanced twenty-nine hundred dollars in cash, and received no return therefor.
Our opinion concludes with this statement, viz.:
“ In the light of these facts, the defendant’s response to the plaintiffs’ telegram, making inquiry as to what he predicated his drafts upon, wants confirmation; and these facts place the defendant in the equivocal attitude of having either misstated the facts in his answer, or of having disposed of a large part of the seed in the interim between the statement and the seizure.
"But, be that as it may, the defendant declined to make any satisfactory arrangement of the matter with plaintiffs’ agent or attorney, notwithstanding he was pressed and importuned to do so. On the contrary, he distinctly stated to them that he did not intend to pay the plaintiffs anything or to ship any seed, unless and until they paid his drafts, notwithstanding he had largely overdrawn his contract at the time,” and had shipped them no seed.
- And now we are for the first time confronted with the following statement, which appears to be wholly at variance with the terms of *1336 the written agreements as well as all the proven facts in the case. It is as follows, viz.:
“There was no stipulation to buy seed for the plaintiff; plainly, every pound of seed which defendant should ship to plaintiff was to be his own and credited to him at market prices ruling at the date of shipment. The advances were not stipulated to be for the purpose of enabling defendant to purchase cotton seed, nor could such have been the intent of the parties, for the contract expressly provided for the advancing of the entire sum before the season of ginning and consequently before any seed could be purchased. The plain meaning of the agreement was that the money was loaned to defendant for his general convenience, and in consideration of its use he was to return it with interest, and additionally sell his cotton to the plaintiff at one dollar per ton above the market price.” Defendant’s brief on application for rehearing, page 3.
On the contrary, the agreement declares that the defendant “in consideration of an advance of twenty-five hundred dollars * * * binds himself and agrees to ship to the (oil company) four hundred tons of cotton seed;” and “ as security for the payment of this advance and the delivery of four hundred tons of good, sound seed,” he obligated himself to execute his mortgage.
Have these plain and unambiguous stipulations of the defendant’s written contract anything like the significance, “that the money was loaned to defendant for his general convenience?”
Quite the contrary.
Yet that statement was necessary for the purposes of this application, and to fortify the defendant’s contention that plaintiffs were amply secured by the mortgage.
But the mortgage was but an incident of the transaction, and only a collateral security for the advances of money plaintiffs made.
Let us contrast the facts thus related, and not denied, with those of the case of Winter vs. Davis.
We make the following extracts therefrom, as they appear quoted in brief of defendant, on this application, viz.:
“In the case of William Winter vs. Nitore H. Davis (No. 12,024), decided by your Honors on the same day as the instant case, the agreement between plaintiff and defendant was embodied in a letter and expressed in these words:
“ I do not hesitate to say that I will ship you at least twenty-five *1337 hundred bales of cotton, provided you will render me the necessary financial aid. I agree to pay you fifty cents commission on each bale you sell for me, and will further agree not to ship cotton elsewhere, or to sell a single bale in this market, but will ship every bale to you.”
Upon this basis the plaintiff advanced large amounts to defendant. The court found upon the evidence that defendant paid other debts than plaintiffs, made a dation to his wife, and actually sold to another party thirty bales of cotton, and received the price.
Upon these facts the court, Mr. Justice Breaux being its organ, said:
■ “ It is further urged by the plaintiff that the defendant was under obligation to buy cotton and ship it to him; that throughout September and to the 7th day of October, 1893, he seemed to have shipped to him, Winter, in accordance with the contract; that on the 7th of October he, despite the contract, shipped about thirty bales of cotton to others than plaintiff, and received the money therefor.
“ The advances, as we understand, were not made for the sole purpose of buying cotton. They were made to aid the defendant in his business. He, as an inducement, promised to ship cotton to the plaintiff, which the latter was to sell and pay himself from the proceeds.
“ There was a breach of contract, a failure to comply with an obligation, not of such a character, however, as to justify an attachment.”
In that case defendant complied with his contract to ship plaintiff twenty-five hundred bales of cotton, and shipped cotton to him during the month of September and part of October; but on the 7th of the latter month, he shipped about thirty bales to other parties, and received the money therefor. But plaintiff’s advances were not made for the sole purpose of enabling defendant to buy cotton. They were made to aid him in his business; and “ he, as an inducement, promised to ship cotton to the plaintiff, which the latter was to sell and pay himself from the proceeds.”
The two cases are altogether dissimilar as to their facts.
The oil company was not engaged in the business of a factor, commission merchant or money lender; nor was the defendant engaged in business as a retail country merchant. Their *1338 relations are specifically set out and defined in a written contract; thereunder the oil company had not only fully performed its engagement and more, but the defendant had failed and refused to perform his engagement in any respect. Thereunder the defendant had placed himself under definite obligation to purchase, control and ship cotton seed to the plaintiffs for a specific purpose. In pursuance thereof the oil company furnished all the money they had agreed to advance the defendant and more; but defendant failed altogether to comply with his contract, except upon the condition that the oil company would continue to pay his drafts without limit, and beyond the terms of its engagement — notwithstanding he had already overdrawn his limit by four hundred dollars. Not only so, but defendant openly declared to a representative of the oil company, that if his condition was not complied with, he would sell the cotton seed he had then on store — and on the faith of which he had drawn his overdrafts and proposed to draw others — to a competing cotton oil company. And upon the following day — or within a day or two at furthest — the defendant’s cotton seed, aforesaid, was discovered on the river bank preparatory to delivery to the seed boat of the U. ion Oil Company, which was expected to pass down the river on the next day.
The oil company’s representative, finding the defendant determined to put it at defiance, gave him a written protest, and placed the matter in the hands of a local attorney. The attorney examined into the situation of affairs, and, finding them as they had been reported to him, he at once procured the attachment of the defendant’s property.
Under this state of facts can it be affirmed that; Matheson was about to assign or dispose of his property,-or some part thereof, with intent to defraud his creditors within the meaning of Code of Practice, Art. 240, par. 4?
In Herman vs. Amedee, 30 An. 394, it was held that the fraudulent intent necessary to support an attachment is not shown by the mere fact that a merchant is selling and paying off his debts, including that of plaintiff. That was defendant’s situation in Winter vs. Davis.
Very much the same may be said of the principle which was announced in Hernsheim vs. Levy, 32 An. 340.
In Lehman vs. McFarland, 35 An. 624, it was held that an attach *1339 ment could not be sustained when the “ proposed disposition of their property by the defendants was in the interest of their creditors, whom they proposed to place on a footing of equality and fairness,” etc.
In Wetherow vs. Oroslin, 24 An. 128, the court sustained an attachment on the faith of defendant’s statement “that he owed the plaintiff some money and was unable to pay them at the time; that they were going to sue him, and he wanted to keep his property, but wanted to pay them.”
In Boyd vs. Labranehe, 35 An. 285, the court sustained an attachment on the ground that plaintiff had good reason to believe that defendant was about to dispose of his property to defraud his creditors, and said:
“Promptness of acfion was the one thing needful. Plaintiff was not required to wait until events had shown what defendant really intended to do. They acted on the state of facts as they existed at the moment,” etc.
In Stephens vs. Helpman, 29 An. 635, the court justified an attachment on the ground that the defendant had given an unfair preference to some of his creditors, and had made representations to the plaintiff, upon which he acted.
In Newman vs. Kraim, 34 An. 910, the court sustained an attachment on the ground that the defendant had made threats that he wonid dispose of his property to protect himself, if he was sued.
It is in proof that plaintiffs wired defendant to ascertain upon what he predicated his overdrafts, and that his response was upon cotton seed stored in his ginhouse; whereas, in fact, defendant either misrepresented his real situation, or he fraudulently disposed of a large part of his cotton seed subsequently.
This statement was at first made to influence the plaintiffs to continue to honor his overdrafts, in the expectation of being reimbursed from cotton seed in store; and, failing in the accomplishment of this design, defendant threatened to sell his seed to a rival company, if plaintiffs declined to pay his overdrafts in the future.
These facts fulfil all the requirements of the Stephens and Newman eases.
The phrase intent to defraud finds an excellent interpretation in Chaffe, Powell & West vs. Gill, 43 An. 1053, in which we held that, as the property of the debtor is the common pledge of his creditor, *1340 every act done by the debtor with the intent of depriving his creditor of the eventual right he has upon the property of such debtor is illegal.” Sustaining an attachment. R. C. C. 1968.
The instant ease presents an even more forcible illustration of that principle, in that the defendant had contracted to purchase, control and ship to plaintiffs the cotton seed he had stored in his ginhouse, and upon which his overdrafts had been drawn; and his openly declared intention to sell them, if plaintiffs refused to pay his future overdrafts, was not only a violation of his contract, but an attempt to deprive them of property which was stored for their account, and was a security for the advances they had already made to defendant on the faith of it.
Manifestly these transactions evidence an intent to defraud.
For the foregoing reasons our original opinion and decree are maintained.